

RECEIVED

NOV 23 2020

BY MAIL

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

### FILED IN CAMERA AND UNDER SEAL
### UNDER 31 U.S.C. 3730, NOT TO BE
### SERVED UPON Defendants UNTIL
### ORDERED BY THE COURT UNDER
### 31 U.S.C. 3730

UNITED STATES OF AMERICA, *ex rel.*
**BRADLEY BIBB, M.D.**                                        **PLAINTIFFS**

v.                                   **CASE NO. _____**

**GAMMA HEALTHCARE INCORPORATED,**
**JERRY MURPHY, and**
**JERROD MURPHY**                                            **DEFENDANTS**

## COMPLAINT UNDER THE FALSE CLAIMS ACT

Relator Bradley Bibb, M.D., by and through his undersigned attorneys, Mitchell Blackstock Law Firm, individually and on behalf of the United States of America (hereinafter "the Government" or "USA"), pursuant to 31 U.S.C. §§ 3729 *et seq.*, hereby alleges the cause of action against Defendants Gamma HealthCare Incorporated, Jerry Murphy, and Jerrod Murphy as follows:

### I. SUMMARY OF CLAIM

1.     This *qui tam* case involves submission of false claims to Medicare and Medicare Advantage plans for laboratory tests that were not ordered by a physician or advanced practice registered nurse practitioner ("APRN"). Under applicable laws, such services are not "medically necessary," and claims for those services are not reimbursable by Medicare or Medicare

Advantage plans or state Medicaid programs. The tests at issue are polymerase chain reaction (PCR) urinalysis tests performed on nursing home patients. Defendants Gamma HealthCare, Inc., and its owners Separate Defendants Jerry Murphy and Jerrod Murphy created and pursued a multi-state scheme to submit false claims and compliance certifications to federally funded health insurance programs by implementing a mandate to perform and charge for these PCR tests without physician's orders. Certifying the medical necessity of such tests (or causing such tests to be certified) -- while knowing that the tests were not ordered and simply were pursued to profit Gamma -- was the submission of a false or fraudulent claim.

## II. JURISDICTION AND VENUE

2.      The United States District Courts have exclusive jurisdiction of actions such as this one which are brought under 31 U.S.C. §§ 3729 *et seq*., popularly known as the False Claims Act (the "FCA" or "Act").

3.      Section 3732(a) of the Act states: "Any action under section 3730 may be brought in any judicial district in which the Defendant or, in the case of multiple Defendants, any one Defendant can be found, resides, transacts business, or in which any act proscribed by section 3729 occurred." This Court has personal jurisdiction over Defendant, and venue is proper here because various acts complained of herein occurred within this judicial district, and the Defendant resides or transacts business in this district.

4.      This Court has subject-matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1345, as well as the provisions of the FCA, including 31 U.S.C. § 3730. Nothing alleged in this Complaint is based upon the public disclosure of any allegations or transactions, within the meaning of 31 U.S.C. § 3730(e)(4)(A). To the extent any of the allegations or transactions set forth herein might have previously been publicly disclosed, the Plaintiff was the "original source" of

2

the information set forth herein that is the basis of such allegations or transactions, within the meaning of 31 U.S.C. § 3730(e)(4)(B).

III. PARTIES

5.      Gamma HealthCare, Inc., (hereinafter "Gamma") is a Missouri for-profit corporation based in Poplar Bluff, Missouri. Gamma is registered to do business in Arkansas.

6.      On its website, Gamma identifies over 30 locations in eight states—Arkansas, Louisiana, Texas, Mississippi, Tennessee, Oklahoma, Missouri, and Illinois—serving over 1,000 long-term care and physician accounts.

7.      Gamma provides laboratory services, mobile ultrasound, and mobile x-ray services to residents of long-term care facilities.

8.      As a result of consolidation in the market, Gamma is the primary provider of long-term care laboratory services in Arkansas.

9.      As a result of a suspension of its licensure by CMS due to the frequency of false-positive and false-positive COVID tests, Gamma's Poplar Bluff and Springfield labs ceased operation, and earlier this month, Gamma announced that it was ceasing operations nationwide.

10.     Jerry Murphy is the CEO and Chairman of the Board of Gamma and is believed to reside in Butler County, Missouri.

11.     Jerrod Murphy is the President and COO of Gamma and is believed to reside in Butler County, Missouri.

12.     Relator Bradley Bibb, M.D., is an owner of approximately thirty (30) Rural Health Clinics in Arkansas and one in Oklahoma; the Rural Health Clinics operate under the name Access Medical Clinic or under the name Bradley Bibb, M.D., PLLC. These health clinics collectively

provide outpatient primary care and primary care to residents of approximately 100 nursing homes in those two states as well as medical director services for many of those nursing homes.

## IV. FACTUAL ALLEGATIONS

### A.    'Reasonable and Necessary' and FCA Liability

13.    The federal Medicare program provides medical care for people age 65, younger persons with disabilities, and persons with end-stage renal disease.

14.    Medicare-eligible individuals can receive medical services through traditional fee-for-service Medicare—Part A (inpatient hospital) and Part B (outpatient services)—or through enrollment in a Medicare Advantage plan (sometimes called Part C), which receives a capitated monthly payment from Medicare for each enrollee and administers the healthcare benefits for enrollees.

15.    Medicare only pays for medical services that are "reasonable and necessary." The Social Security Act states that "no payment may be made under Part A or Part B [of Medicare] for any expenses incurred for items or services which . . . are not reasonable and necessary . . . for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(A).

16.    Medicare regulations state that "[laboratory] tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary." 42 C.F.R. § 410.32(a). Diagnostic lab tests, such as urinalysis, are considered "reasonable and necessary" when they are ordered by an APRN who is operating within her scope of practice and who is treating the patient. 42 C.F.R. § 410.32(a)(2).

17.    The FCA makes liable anyone who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," or "knowingly makes, uses or causes to be

4

made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A), (B). An FCA claim requires a showing of: (1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money. Gamma engaged in a multi-state scheme involving nursing home patients in which it routinely performed expensive tests – that were not ordered by the attending healthcare provider – and then billed Medicare or government-funded Medicare Advantage programs for the unordered tests. When Gamma submitted claims for payment, it did not reveal to the Medicare or Medicare Advantage programs that the tests were never ordered by a physician. Gamma knew that the applicable laws and regulations allowed reimbursement only for services that were "reasonable and necessary" and that only services ordered by the attending physician or APRN were "reasonable and necessary." Therefore, Gamma's claims for unordered PCR tests were fraudulent, and if Medicare and the government-funded Medicare Advantage plans had known that, they would not have reimbursed Gamma for the claims.

18.     FCA liability encompasses false claims made to a Medicare Advantage plan. 31 U.S.C. § 3729(b)(2)(A)(ii).

19.     This action against Gamma is a false certification case for claims made to Medicare and to state Medicaid programs and for claims made to Medicare Advantage plans, including Tribute Medicare Advantage.

20.     Gamma's claims for PCR tests are false because the claims are tainted by an underlying statutory or regulatory violation that renders the claim ineligible for reimbursement. Specifically, Gamma knowingly violated the laws and regulations mandating that providers only bill the government for "reasonable and necessary services" for beneficiaries of government-funded insurance programs such as Medicare, Medicaid, and Medicare Advantage programs. The

services were not "reasonable and necessary" because they were not ordered by the physician or APRN treating the patient. 42 C.F.R. § 410.32(a).

21.     It is fraudulent when a government payee falsely certifies compliance with a particular statute, regulation or contractual term where compliance is a prerequisite to payment. Compliance with the "reasonable and necessary" standard is a precondition to government reimbursement for the claim. Gamma falsely certified or represented compliance with Medicare laws and regulations.

22.     When Gamma submitted its Medicare Enrollment Application, CMS-855B, Gamma agreed to a "Certification Statement" included at Section 15 in which each enrollee agrees to abide by the Medicare laws, regulations and program instructions that apply to the healthcare provider. The Certification at paragraph 3 also reads, "I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with" Medicare laws, regulations and program instructions and on the provider's "compliance with all applicable conditions of participation in Medicare." At paragraph 6, the Certification reads: "I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and I will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity." Gamma made these certifications in order to be enrolled in and be reimbursed by Medicare.

23.     Because Medicare enrollment is a requirement for participation in a Medicare Advantage plan, these false certifications apply to claims submitted to Tribute Medicare Advantage and all other Medicare Advantage plans as well. When Gamma submitted claims for PCR tests that were not ordered by the physician or APRN, it knowingly and falsely relied on its certifications that it was in compliance with applicable laws, regulations, program instructions and all applicable conditions of Medicare participation and was entitled to payment.

6

24.     Each time Gamma submitted the unordered PCR claims to Medicare, it used the electronic version of CMS Form 1500, which includes the statement: "I hereby certify that the services shown on this form were medically indicated and necessary for the health of the patient...." The Medicare Claims Processing Manual (Rev. 10319, 08-28-20) in Chapter 24 at 30.2 "New Enrollments and Maintenance of Existing Enrollments," includes under subsection A that the provider agrees to certain provisions for electronically submitted claims to CMS. Those provisions include that the provider "will submit claims that are accurate, complete and truthful" and that it will acknowledge that all claims will be paid from Federal funds, that the submission of such claims is a claim for payment under the Medicare program, and that anyone who misrepresents or falsifies or causes to be misrepresented or falsified any record or other information related to that claim that is required pursuant to this agreement may, upon conviction, be subject to a fine and/or imprisonment under applicable Federal law.

25.     By submitting claims for PCR tests that were not ordered by the attending physician or APRN, Gamma relied on its certifications that it had met the requirements of applicable statutes and regulations that are a precondition to payment and that Gamma was entitled to payment. Gamma has liability under the FCA because it submitted these claims for payment while knowing that payment was expressly precluded because of its noncompliance with material provisions of the law. Gamma's representations in making the PCR claims therefore were actionable misrepresentations under the FCA. If Medicare or Tribute Medicare Advantage had known that the PCR tests did not meet the "reasonable and necessary" standard, neither would have paid for the tests. Gamma knowingly violated this legal requirement that it knew was material to their decision to pay the claims. Submitting a claim under the false pretense of entitlement is fraudulent.

7

26.    Gamma knew that Medicare and Medicare Advantage plans will not pay claims for lab services such as those in this complaint if they knew the test was not ordered by the treating physician or APRN.

27.    "Knowing and Knowingly" under 31 U.S.C. § 3129(b)(1)(A) means that a person, with respect to the information (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information. The terms do not require proof of specific intent to defraud. 31 U.S.C. § 3129(b)(1)(B).

28.    The term "material" means "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3129(b)(4).

**B.    Medicare, Tribute Advantage Re: Nursing Home Residents**

29.    Laboratory services are billed by the lab and paid by Medicare for some long term care residents. Medicare may pay for laboratory tests even when the stay in the nursing home is not paid for by Medicare. If the resident also has a Medicare Advantage plan, then the plan also may pay lab costs.

30.    Medicare covers skilled nursing care in nursing homes for up to 100 days per benefit period if the beneficiary requires skilled care and has had a three-day qualifying inpatient hospital stay. 42 C.F.R. § 409.30(a).

31.    After Medicare coverage of skilled nursing facility care runs out, or if an individual is not eligible for skilled care, many individuals obtain coverage for nursing facility care through the state's Medicaid program—the state and federal partnership that provides medical care for persons who are poor and for many children who would otherwise be uninsured. Medicare continues to be the primary payer for services other than the nursing home service.

32.     For individuals eligible for Medicare skilled care, the nursing home receives reimbursement on a per diem basis that is intended to cover all services related to the services furnished to beneficiaries under Medicare Part A.

33.     For individuals receiving Medicare-funded skilled care, the nursing home pays for laboratory services necessary for the diagnosis of medical conditions.

34.     Tribute Advantage, which has paid some of the claims at issue in this case, is a Medicare Advantage plan with agreements with both Medicare and Arkansas Medicaid. Medicare-eligible Arkansans who are also eligible for Medicaid may enroll in Tribute Advantage. Tribute Advantage enrolls only individuals who are eligible for both Medicare and Medicaid. As a result, any patient copayment that would otherwise be due is instead billed by Gamma to the state Medicaid program.

35.     Tribute Advantage receives money from the federal government in the form of a capitated monthly payment. Thus, Tribute Advantage uses government funds to reimburse providers for medical services.

36.     For nursing home patients, situations can arise where the primary care provider believes that a urine culture is needed more quickly than Gamma can provide. Relators are aware that Gamma has contracted with local hospitals to provide the cheaper urine culture. Gamma then took a portion of the urine sample and billed and received payment for the unordered, medically unnecessary, higher-price PCR tests.

37.     A Medicare Advantage plan is a government contractor for purposes of the False Claims Act, and therefore, liability attaches for a false claim to such a contractor. 31 U.S.C. § 3729(b)(2)(A)(ii). Tribute Medicare Advantage Plan is a government contractor.

### C. Diagnosis and Treatment of Urinary Tract Infections

38.     Urinary tract infections are not uncommon in long term care facilities. If a nursing home resident displays symptoms of a possible urinary tract infection (UTI), the nursing home contacts the resident's physician or other primary care provider.

39.     The first diagnostic test for possible UTI is urinalysis, which involves visual examination of a urine sample, microscopic examination, and chemical examination through use of a dipstick—a thin plastic strip treated with chemicals that react and change color if levels of certain bacteria are above normal.

40.     Depending on the results of the urinalysis, a medical provider may order a urine culture. For a urine culture, a sample of urine is put in a petri dish and stored at body temperature. Over the next two or three days, bacteria or yeast in the urine sample will multiply and grow. A lab employee looks at the culture under a microscope to identify the type(s) of bacteria that are present. This information is sent back to the doctor, who uses the urine culture results to determine which drug(s) to prescribe to treat the UTI.

41.     The urine culture has been described as the "gold standard" in diagnosis of UTI.

### D. Gamma Performs and Bills for Tests Not Ordered by a Patient's Physician and Therefore Not Medically Necessary

42.     In the second quarter of 2020, it came to Dr. Bibb's attention that when an Access Medical Clinic physician or nurse practitioner ordered a urine culture from Gamma, the lab report would also include a polymerase chain reaction (PCR) test, which was not ordered by the physician or the APRN.

43.     The PCR process copies small segments of DNA for medical testing purposes.

44.     Earlier this year, Gamma sent a letter to its nursing home clients telling them that any time there is a positive urinalysis result, Gamma would automatically add on the PCR test.

10

See Exhibit 1, an undated letter from Jerrod Murphy of Gamma, with an undated attachment from Dr. Anthony Hardin, also of Gamma, that discusses urinary tract infections in long-term care residents. On page 2 of Exhibit 1, under the bold "QuantStudio Flex Real Time PCR System," it explains that when a urinalysis is positive, "a portion of the sample will be diverted for polymerase chain reaction ("PCR") analysis. On page 3 of the Exhibit, it reads, "In closing, this advisory is geared primarily towards elderly LTC [long term care] residents without indwelling urinary catheters."

45.      Gamma has implemented this new directive, performing the PCR test when the medical provider ordered only a urine culture.

46.      PCR tests for possible UTI are significantly more expensive than urine culture. For example, Gamma charged one nursing home $28.86 for urinalysis and urine culture. [Exhibit 2, Page 1, Patient A.] The PCR tests for another patient added another $417.52 to Gamma's invoice to the nursing home. [Exhibit 2, Page 2, Patient B.]

47.      When Gamma bills for PCR tests for UTIs, it actually bills for tests to identify seventeen organisms. Four of the tests have a specific CPT code under which they are billed—87481—candida species, amplified probe technique; 87500—vancomycin resistance; 87641—staphylococcus aureus, methicillin resistant, amplified probe technique; and 87651—streptococcus, group A, amplified probe technique. For the other thirteen (13) organisms, Gamma bills for thirteen (13) units of CPT code 87798—infectious agent detection by nucleic acid (DNA or RNA), not otherwise specified, amplified probe technique, each organism.

48.      One published study on the efficacy of PCR vs. urine culture found only that PCR is no less accurate than traditional urine culture.

49.     As of the date of this Complaint, no peer-reviewed study was found that compares the cost effectiveness of PCR tests vs. urine cultures.

50.     Gamma is using the same scheme to bill unordered PCR tests in other states where it provides services.

**E.     Tribute Medicare Advantage Complaint with Qlarant**

51.     On June 26, 2020, Tribute Advantage, a Medicare Advantage plan, filed a complaint with Qlarant, the Medicare contractor that handles complaints in the Medicare Advantage and Part D (prescription drug) programs. The complaint was based on a referral from Dr. Bibb and his clinics that Gamma was performing and billing for tests that were not ordered by the doctor.

52.     The Tribute complaint indicated that the provision of the medically unnecessary tests had begun at least as early as February 1, 2020.

53.     Tribute Advantage received a response from Qlarant dated July 31, 2020, which stated that Qlarant was closing their file on the complaint "[b]ased on the active investigation being conducted by law enforcement."

**F.     Identification of Specific False Claims**

54.     Relators have documentation for specific individuals for whom Gamma performed the PCR tests and received payment from Medicare, even though only a urine culture was ordered, and in some cases, the healthcare provider specifically stated that no PCR test was to be done.

55.     Patients One through Eleven were enrolled in Tribute Medicare Advantage. Each time Gamma its array of seventeen medically unnecessary PCR tests, Gamma charged Tribute $1,789.59. Medicare's "allowable" charge for the seventeen tests $596.53. Tribute paid Gamma 80% of the Medicare allowable minus a 2% sequestration (which was suspended by the Cares Act

from May 1, 2020, through December 31, 2020) for a total payment of $467.88. Because these patients were enrolled in Tribute Advantage, a plan for individuals who are dually eligible for Medicaid and Medicare, Gamma billed the remaining coinsurance amount of $119.31 to the Arkansas Medicaid program.

56.     Patients Twelve through Thirteen were covered by traditional Medicare Part B. For each array of seventeen medically unnecessary tests, Gamma billed Medicare $1,789.59. Medicare paid Gamma their allowed amount of $596.53. Patients in traditional Medicare Part B do not pay any coinsurance for lab work.

57.     Two urinalysis tests were ordered for Patient One, who was a resident in Rogers Health and Rehabilitation Center, 1149 W. New Hope Rd., Rogers, Arkansas. On 4/13/2020, a "UA with C&S" was ordered by Access-employed APRN Jennifer Mira. Gamma performed a complete urinalysis and a "UT ID by PCR," which was not ordered by the APRN or her collaborating physician, Kimberly Burner, M.D. Then on 8/12/2020, a "UA with C&S, NO PCR" was ordered by APRN Mira. Gamma performed a complete urinalysis and a "UT ID by PCR," despite the instructions specifically stating no PCR was to be done. In both cases, the Gamma tests were paid for by Tribute Medicare Advantage Plan. For the 8/12/2020 test, part of the urine sample was sent to the lab at Washington Regional Medical Center for the less expensive regular urinalysis, and the rest of the urine sample was sent to Gamma for the much more expensive and medically unnecessary PCR tests. [Exhibit 3.]

58.     Two urinalysis tests were ordered for Patient Two, who was also in Rogers Health and Rehabilitation Center. On 3/31/2020, a "UA with C&S" was ordered by APRN Mira. Gamma performed a complete urinalysis and a "UT ID by PCR." The PCR test was not ordered by the APRN or her collaborating physician. On 4/30/2020, a "UA with C&S" was ordered by APRN

Mira. Gamma performed a complete urinalysis and a "UT ID by PCR." The PCR test was not ordered by the APRN or her collaborating physician Dr. Burner. In both cases, the Gamma tests were paid for by Tribute Medicare Advantage Plan. For both tests, part of the urine sample was sent to the lab at Washington Regional Medical Center for the less expensive regular urinalysis, and the rest of the urine sample was sent to Gamma for the much more expensive and medically unnecessary PCR tests. [Exhibit 4.]

59.     On 2/28/2020, a "UA with C&S" was ordered by APRN Mira for Patient Three, who was also in Rogers Health and Rehabilitation Center. Gamma performed a complete urinalysis and a "UT ID by PCR." The PCR test was not ordered by the APRN or her collaborating physician Dr. Burner. The Gamma PCR test was paid for by Tribute Medicare Advantage Plan. Part of the urine sample was sent to the lab at Washington Regional Medical Center for the less expensive regular urinalysis, and the rest of the urine sample was sent to Gamma for the much more expensive and medically unnecessary PCR test. [Exhibit 5.]

60.     Patient Four, also a resident of Rogers Health and Rehabilitation Center, had two urinalysis tests. On 4/18/2020, a "UA with C&S" was ordered by APRN Mira. Gamma performed a complete urinalysis and a "UT ID by PCR." The PCR test was not ordered by the APRN or her collaborating physician Dr. Burner. The Gamma PCR test was paid for by Tribute Medical Advantage Plan. Part of the urine sample was sent to the lab at Washington Regional Medical Center for the less expensive regular urinalysis, and the rest of the urine sample was sent to Gamma for the much more expensive and medically unnecessary PCR test. On 8/18/2020, a "UA with C&S, no PCR" was ordered by APRN Mira. Gamma performed a complete urinalysis and a "UT ID by PCR," despite the instructions stating no PCR was to be done. The Gamma tests were paid for by Tribute Medicare Advantage Plan. [Exhibit 6.]

14

61.     On 2/10/2020, a "UA with C&S" was ordered by APRN Naomi Harrod for Patient

Five, who resided in Apple Creek Health & Rehab, LLC, 1570 W. Centerton Blvd., Centerton,

AR. Gamma performed a complete urinalysis and a "UT ID by PCR." The PCR test was not

ordered by the APRN or her collaborating physician Dr. Burner. The Gamma PCR test was paid

for by Tribute Medicare Advantage Plan. Part of the urine sample was sent to the lab at Washington

Regional Medical Center for the less expensive regular urinalysis, and the rest of the urine sample

was sent to Gamma for the much more expensive and medically unnecessary PCR test, which was

not ordered by the health care provider. The Gamma tests were paid for by Tribute Medicare

Advantage Plan. [Exhibit 7.]

62.     On 3/4/2020, a "UA via cath with C&S" was ordered by APRN Harrod for Patient

Six, also in Apple Creek Health & Rehab, LLC. Gamma performed a complete urinalysis and a

"UT ID by PCR." The PCR test was not ordered by the APRN or her collaborating physician Dr.

Burner. The Gamma PCR test was paid for by Tribute Medicare Advantage Plan. Part of the urine

sample was sent to the lab at Washington Regional Medical Center for the less expensive regular

urinalysis, and the rest of the urine sample was sent to Gamma for the much more expensive and

medically unnecessary PCR test not ordered by the health care provider. The Gamma tests were

paid for by Tribute Medicare Advantage Plan. [Exhibit 8.]

63.     On 2/17/2020, a "UA with C&S" was ordered by APRN Harrod for Patient Seven,

also in Apple Creek Health & Rehab, LLC. Gamma performed a complete urinalysis and a "UT

ID by PCR." The PCR test was not ordered by the APRN or her collaborating physician Dr. Burner.

The Gamma PCR test was paid for by Tribute Medicare Advantage Plan. Part of the urine sample

was sent to the lab at Washington Regional Medical Center for the less expensive regular

urinalysis, and the rest of the urine sample was sent to Gamma for the much more expensive and

medically unnecessary PCR test not ordered by the health care provider. The Gamma tests were paid for by Tribute Medicare Advantage Plan. [Exhibit 9.]

64.     On 5/1/2020, a "UA with C&S r/t dysuria" was ordered by APRN Harrod for Patient Eight, also in Apple Creek Health & Rehab, LLC. Gamma performed a complete urinalysis and a "UT ID by PCR." The PCR test was not ordered by the APRN or her collaborating physician Dr. Burner. The Gamma PCR test was paid for by Tribute Medicare Advantage Plan. Part of the urine sample was sent to the lab at Washington Regional Medical Center for the less expensive regular urinalysis, and the rest of the urine sample was sent to Gamma for the much more expensive and medically unnecessary PCR test, which was not ordered by the health care provider. The Gamma tests were paid for by Tribute Medicare Advantage Plan. [Exhibit 10.]

65.     On 4/6/2020, a "UA with C&S" was ordered by Dr. Thanh Tan Le, who is an independent contractor M.D. hired by Access, for Patient Nine in Ashton Place Health & Rehab, LLC, 318 Strozier Lane, Barling, Arkansas. Gamma performed a complete urinalysis and a "UT ID by PCR." The PCR test was not ordered by Dr. Le or the physician's APRN Candace Cartwright. The order was for "UA with C & DS," which likely should have read "UA with C&S." In any event, no PCR test was ordered. The Gamma PCR test was paid for by Tribute Medicare Advantage Plan. Part of the urine sample was sent to the lab at Baptist Health Fort Smith for the less expensive regular urinalysis, and the rest of the urine sample was sent to Gamma for the much more expensive and medically unnecessary PCR test, which was not ordered by the health care provider. The Gamma test was paid for by Tribute Medicare Advantage Plan. [Exhibit 11.]

66.     On 2/24/2020, a "UA with C&S" was ordered by APRN Candace Cartwright for Patient Ten, who also resided in Ashton Place Health & Rehab, LLC. Gamma performed a complete urinalysis and a "UT ID by PCR," The PCR test was not ordered by the APRN or her

collaborating physician, Dr. Le. The Gamma PCR test was paid for by Tribute Medicare Advantage Plan. [Exhibit 12.]

67.     Two urinalysis tests were ordered for Patient Eleven, who also resided in Ashton Place Health & Rehab, LLC. On 2/1/2020, a "UA, Reflex to C&S STAT for DYSURIA related to URINARY TRACT INFECTION" was ordered by Dr. Thanh Tan Le. Gamma performed a complete urinalysis and a "UT ID by PCR." On 2/19/2020, a "UA with C&S if indicated" was ordered by APRN Cartwright. Gamma performed a complete urinalysis and a "UT ID by PCR." The PCR tests were not ordered by the APRN or her collaborating physician Dr. Le. The Gamma PCR tests were paid for by Tribute Medicare Advantage Plan. [Exhibit 13.]

68.     On or about 8/30/2020, William Robert Anderson, D.O., ordered a urine culture for Patient Twelve at Aspen Health & Rehabilitation, 1251 W. Houston St., Broken Arrow, Oklahoma. Gamma performed a urinalysis, macro with reflex to micro and a "UTI ABR PCR." The PCR test was not ordered by Dr. Anderson. The Gamma PCR test was paid for by Medicare Part B. Part of the urine sample was sent to the lab at Hillcrest Hospital South in Tulsa, Oklahoma, for the less expensive regular urinalysis, and the rest of the urine sample was sent to Gamma for the much more expensive and medically unnecessary PCR test. [Exhibit 14.]

69.     On or about 2/23/2020, APRN Leigh Ann Shockley ordered "UA STAT" for Patient Thirteen, who was a resident of Belvedere Nursing and Rehabilitation Center, LLC, 2600 Park Avenue, Hot Springs, Arkansas. Gamma performed the PCR tests, which were not ordered by the health care provider. The Gamma tests were paid for by Medicare Part B. [Exhibit 15.]

## V.     COUNTS

**COUNT ONE**
**Gamma's Presentment of False Claims to Medicare Part B in violation of 31 U.S.C. §3729(a)(1)**

70.     Plaintiff realleges and incorporates the allegations contained in Paragraphs 1 through 69 as if fully set forth herein.

71.     Gamma perpetrated and continues to perpetrate a multi-state scheme in which it presented false claims to Medicare for PCR tests that were not ordered by a patient's physician or APRN ("the Gamma PCR tests") despite its certification of compliance with applicable laws and regulations at the time of Medicare enrollment and each time it submitted a claim.

72.     Gamma presented claims for reimbursement despite knowing that the Gamma PCR tests were not reasonable and necessary under the Medicare standards for reimbursable tests.

73.     Unaware of the falsity of the claims, the United States paid for claims that it would not have paid had it been aware of the legal falsity of the claims.

74.     The United States, as a result of paying these claims, has been damaged and continues to be damaged in a financial amount not yet determined.

75.     Certifications to Medicare that the Gamma PCR tests were "reasonable and necessary" were false under the FCA since tests that are not ordered at the direction of the treating physician are never "reasonable and necessary" under the government's definition of the phrase at 42 C.F.R. §410.32(a).

76.     By submitting these claims, Gamma is pursuing a fraudulent course of conduct by billing Medicare, for PCR tests that were never ordered by the patient's physician or nurse practitioner in violation of the Medicare requirement that payment be made only for "reasonable and necessary" items or services. 42 U.S.C. 1395y(a)(1)(A).

77.     As a Medicare provider, Gamma was aware of the Medicare requirements for reimbursement of urinalysis testing and of the fact that if it had revealed to Medicare that the PCR tests were never ordered by a physician, then the claims would not have been paid. Gamma

misrepresented to the government that the PCR claims were proper, *i.e.* ordered by the attending physician or APRN. Gamma's false statements and fraudulent course of conduct was material, causing the government to pay out money for the PCR tests.

**COUNT TWO**
**Gamma's Presentment of False Claims to Medicare Advantage Plans in violation of 31 U.S.C. §3729(a)(1)**

78.     Plaintiff realleges and incorporates the allegations contained in Paragraphs 1 through 77 as if fully set forth herein.

79.     Gamma perpetrated and continues to perpetrate a multi-state scheme in which it presented false claims to Medicare Advantage plans for PCR tests that were not ordered by a patient's physician or APRN ("the Gamma PCR tests") despite Gamma's certification of compliance with applicable laws and regulations each time it submitted a claim and despite its certification of compliance upon its enrollment in Medicare that it would abide by the Medicare laws, regulations and program instructions that applied to it and despite its promise to not to present a false or fraudulent claim for payment to Medicare. Tribute Medicare Advantage Plan, like other such plans, require use of the same CMS paper or electronic submission forms as used for Medicare, including the same certifications regarding compliance. Tribute Medicare Advantage Plan, like other such plans, require providers to be enrolled in the regular Medicare program; therefore, the certifications regarding compliance associated with Medicare enrollment also apply to provider participation in Medicare Advantage plans.

80.     Gamma presented claims for reimbursement despite knowing that the Gamma PCR tests were not reasonable and necessary under the Medicare standards for reimbursable tests.

81.     Unaware of the falsity of the claims, the Medicare Advantage plans paid for claims that they would not have paid had they been aware of the legal falsity of the claims.

82.     The United States, as a result of its contractors' paying these claims, has been damaged and continues to be damaged in a financial amount not yet determined.

83.     Certifications to Medicare Advantage plans that the Gamma PCR tests were "reasonable and necessary" were false under the FCA since tests that are not ordered at the direction of the treating physician are never "reasonable and necessary" under the government's definition of the phrase at 42 C.F.R. §410.32(a).

84.     By submitting these claims, Gamma is pursuing a fraudulent course of conduct by billing Medicare Advantage plans for PCR tests that were never ordered by the patient's physician or nurse practitioner in violation of the Medicare requirement that payment be made only for "reasonable and necessary" items or services. 42 U.S.C. 1395y(a)(1)(A).

85.     As a Medicare provider, Gamma was aware of the Medicare requirements for reimbursement of urinalysis testing and of the fact that if it had revealed to Medicare Advantage plans that the PCR tests were never ordered by a physician or APRN, then the claims would not have been paid. Gamma misrepresented that the PCR claims were proper, *i.e.* ordered by the attending physician or APRN. Gamma's false statements and fraudulent course of conduct was material and caused the Medicare Advantage plans, as government contractors, to pay out money for the PCR tests.

**COUNT THREE**
**Jerry and Jerrod Murphy's Knowing Use of False Statements Material to the False Claims in violation of 31 U.S.C. §3729(a)**

86.     Plaintiff realleges and incorporates the allegations contained in Paragraphs 1 through 85 as if fully set forth herein.

87.     In their positions as President/COO and CEO/Chairman of the Board of Gamma, Jerry and Jerrod Murphy knew that Gamma was beginning to perform and bill for medically

unnecessary PCR tests even when they were not ordered. Gamma described itself in a press release as a "family-owned" company; therefore, the Murphys would have been well aware of this change.

88.     As described previously in Paragraph 44, Jerrod Murphy sent out a letter to customers announcing the new change, accompanied by a longer letter from Dr. Hardin making it clear that the additional testing made possible by the "QuantStudio Flex Real Time PCR System" would be for used PCR tests on every urine vulture that tested positive.

89.     The Murphys never told physicians or payors or nursing homes that they intended to perform the medically unnecessary PCR tests even when they weren't ordered, or, even more outrageously, even when a physician specifically said "No PCR." (See Exhibit 6, Patient Four's 8/12/20 order.)

90.     The Murphys did not submit claims to Medicare or Medicaid or Medicare Advantage plans themselves; they directed the individuals who did their billing to do so. And the Murphys did not perform the actual PCR tests; they directed their lab techs to do so. As a result of the statements made by the Murphys to their billers and lab techs, they caused the submission of thousands of false claims, a sample of which are identified earlier in this Complaint.

91.     The Murphys were not responsible for diagnosing patients or prescribing medications for UTIs or any other condition; that was the job of the physician or APRN. The Murphys directed the performance of and billing for the medically unnecessary PCR tests as a way to increase revenue, expand Gamma's business, and enrich themselves as owners.

## PRAYER FOR RELIEF

Plaintiff demands judgment against the Defendants and each of them-as follows:

1.     That by reason of the violations of the False Claims Act, this Court enter judgment in favor of the United States and against Defendants in an amount equal to three times the amount

of damages the United States Government has sustained because of Defendant's actions, plus a civil penalty at the current applicable penalty rate of not less than $11,665.00 and not more than $23,331.00 for each violation of 31 U.S.C. § 3729;

2.      That the Relator, as a *qui tam* Plaintiff, be awarded the maximum amount allowed pursuant to Section 3730(d) of the False Claims Act and/or any other applicable provision of law;

3.      That the Relator be awarded all costs of this action, including attorney's fees and court costs;

4.      That Plaintiff be granted a trial by jury; and

5.      That Plaintiff have such other relief as the Court deems just and proper.

Respectfully submitted,

Mitchell, Blackstock & Sneddon, PLLC
1010 West 3rd Street
Little Rock, AR 72201
(501) 378-7870
chicks@mitchellblackstock.com

By:     *Charles R. Hicks*

Charles R. Hicks, ABN 79087